```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3
     WILLIAM LANGLEY,              )
 4                                 )
              Plaintiff,           )
 5                                 )
     v.                            )     NO. H-13-CV-3595
 6                                 )     March 6, 2014
     DIRECTOR OF HUMAN             )
 7   RESOURCES, HOWARD HUGHES      )
     MANAGEMENT CO., LLC, AS       )
 8   PLAN ADMINISTRATOR FOR THE    )
     HOWARD HUGHES MANAGEMENT      )
 9   CO., LLC SEPARATION           )
     BENEFITS PLAN,                )
10                                 )
              Defendant.           )
11

12                     PRETRIAL CONFERENCE
               BEFORE THE HONORABLE LYNN N. HUGHES
13

14    For the Plaintiff:          Mark J. Oberti
                                   Edwin Sullivan
15                                 Oberti Sullivan, LLP
                                   723 Main, Suite 340
16                                 Houston, Texas 77002

17    For the Defendant:          John H. McDowell, Jr.
                                   Matthew G. Nielsen
18                                 Andrews & Kurth
                                   1717 Main Street, Suite 3700
19                                 Dallas, Texas  75201

20                                 J. Marshall Horton
                                   Andrews & Kurth
21                                 600 Travis, Suite 4200
                                   Houston, Texas  77002
22

23    Court Reporter:             Bruce Slavin, RPR, CMR

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | THE COURT:  Tell me, briefly, the logic that the                   |
|        | 2  | Howard Hughes ERISA plan includes the annual salary.  And          |
|        | 3  | does it include the contingent fee business?                       |
|        | 4  | MR. OBERTI:  The severance plan?                                    |
| 15:01  | 5  | THE COURT:  Yes.                                                    |
|        | 6  | MR. OBERTI:  Yes, Your Honor.  Actually, you hit on                 |
|        | 7  | one more reason that I have neglected to mention in my             |
|        | 8  | voluminous briefing why we win, because if you actually look       |
|        | 9  | at the plan -- which I brought the relevant section with           |
| 15:01  | 10 | me -- if you turn to Page 2 -- this is the plan itself, not         |
|        | 11 | the summary plan description -- and you see Section 3.1            |
|        | 12 | talks about how you calculate the separation benefits and          |
|        | 13 | it's based on weeks of pay.  Then Section 3.2 says "'weeks         |
|        | 14 | of pay' means gross annual base salary" --                          |
| 15:02  | 15 | THE COURT:  I have read it.  You gave it to me.  I                  |
|        | 16 | can read it.  It's on my website.                                   |
|        | 17 | MR. OBERTI:  Sorry, Your Honor.  My point is --                     |
|        | 18 | THE COURT:  You probably do that to juries, too.                   |
|        | 19 | They've all got the exhibits in their hands.                        |
| 15:02  | 20 | MR. OBERTI:  My point, Your Honor, is their                         |
|        | 21 | argument is that, as a result of him being eligible to             |
|        | 22 | receive --                                                          |
|        | 23 | THE COURT:  I know what it says.  I have read all                   |
|        | 24 | their stuff, too.                                                   |
| 15:02  | 25 | MR. OBERTI:  My point is that that proves that all                  |

1    that does is reduce the amount of the benefit.  It doesn't

2    exclude you from entitlement to the benefit to begin with.

3         THE COURT:  It says you don't get all the funky

4    things as a severance benefit.

15:02   5         MR. OBERTI:  That's right.

6         THE COURT:  Even if he got a hundred-

7    thousand-dollar bonus the whole time -- the four or five

8    years he was there, he doesn't get a bonus with severance.

9    He gets his base pay.

15:03  10         MR. OBERTI:  Exactly.

11         THE COURT:  And I don't know what they do for

12    commissions -- guys who get nothing but commission.

13    Probably just average their gross intake.

14              This doesn't seem hard to me.  His eligibility

15:03  15    for a special payment -- He was on the payroll.  He got --

16    Y'all sent him a W-2 every year.  The checks cleared.

17    That's also a part of the deal.  If he sold it in '11 --

18    Does he have the side deal for one percent that Howard

19    Hughes sent him?

15:03  20         MR. OBERTI:  Not anymore.

21         THE COURT:  But did he?  Back when he was a

22    non-employee from '07 through '12.

23         MR. OBERTI:  Right.  Our argument is --

24         THE COURT:  No.  I want to know the facts.  Was

15:04  25    there a one-percent contingency if Hughes had sold it in

1    '11?

2            MR. OBERTI:  Before they bought it or after Hughes

3    bought it?  They say yes.  We say we don't know, but it

4    doesn't matter.

15:04   5            THE COURT:  Hughes bought it in 2007?

6            MR. OBERTI:  No.  No.  2011.

7            THE COURT:  In '11?

8            MR. OBERTI:  Right.  That's when they bought it --

9    TWOC, The Woodlands Operating Corporation.  My answer would

15:04   10   be after that -- my answer is -- although it doesn't matter,

11   ultimately, my answer is, no, he would not have been

12   entitled to that one percent.

13           THE COURT:  But he had a deal with The Woodlands.

14           MR. OBERTI:  Right.

15:04   15           THE COURT:  But that was before and it was before

16   The Woodlands.  When it was sold he got his one percent.

17           MR. OBERTI:  No.  No.  Not when it was sold to

18   Howard Hughes.  The deal -- which there is a copy of in the

19   materials sent you -- the deal gives specific properties

15:05   20   that The Woodlands Operating Corporation owned.  There's two

21   properties mentioned in the deal.  One was sold in '07 and

22   he did get the one-percent commission, which was 340,000.

23           Howard Hughes comes in and buys the TWOC in

24   2011.  They say, if the other property had been sold, he

15:05   25   would have got the one percent on that, too.  It never was

1  sold.  He never got the money.  And in their own documents
2  they --
3          THE COURT:  Even if he had gotten it, it was for --
4          MR. OBERTI:  It wouldn't have mattered.
15:05  5          THE COURT:  He doesn't get it -- If it sold, he got
6  another 340,000 and they paid him 200,000 a year, he's not
7  going to get a severance pay of $540,000.
8          MR. OBERTI:  Right.  He's just going to get his
9  base salary.
15:05  10          THE COURT:  He gets his base salary.
11          MR. OBERTI:  It is clear, Your Honor, as much as I
12  tried to butcher it up.
13          THE COURT:  I rest my case.
14                  After Hughes bought the golf course or club or
15:06  15  whatever you call it, he was paid a regular biweekly salary.
16  Right?
17          MR. McDOWELL:  Correct.
18          THE COURT:  You sent him a W-2 at the end of the
19  year?
15:06  20          MR. McDOWELL:  Right.  Employment at will.
21          THE COURT:  I am not talking about at will.  You're
22  an employee if you get paid to work.
23          MR. McDOWELL:  That's correct.
24          THE COURT:  He wasn't an employee.  They gave him
15:06  25  money, but he wasn't really on the payroll.  On the other

1    hand, I had a company say that the guy was still on the

2    payroll.  They fired him two years ago or something happened

3    to him.  'Oh, well, if they're eligible for rehire, we leave

4    them on the payroll.'  Apparently, it's a convenience for

15:06  5    reactivating the account.  I said, you know, he's not -- the

6    day he doesn't work and you don't pay him for it he's not an

7    employee.  That's what an employee is.

8              What's his name?

9         MR. OBERTI:  Langley.

15:07  10         THE COURT:  Langley.  First aircraft carrier.

11         MR. OBERTI:  He's got something working for him

12    now, not as good as Hughes.

13         THE COURT:  Clearly.  I think we're all in

14    agreement on that.

15:07  15         MR. OBERTI:  Stipulated.

16         THE COURT:  Langley showed up from Hughes' purchase

17    in 2011 and got paid a regular salary.  He had the

18    potential -- I don't know it matters whether he did or not,

19    but assume he had the potential for a one-percent commission

15:07  20    if they had sold it before he quit.  Either way, his

21    severance is his base salary, in effect.

22         MR. McDOWELL:  Your Honor, we're focused on one

23    page, but on the next page we have the answer to your

24    question, and that is that, when you're not eligible -- and

15:08  25    we have the eligibility and we have when you're not

1    eligible.  And when you're not eligible is if you have got

2    something -- another plan.  And, clearly, he had another

3    plan.  He had another plan that paid him $340,000 in 2007

4    and would have paid him again.  It was a plan for him

15:08    5    because he was running these two country clubs.  And if you

6    sell a country club you're very, very likely to be

7    terminated.  The maids aren't going to get terminated.  The

8    golf guys aren't going to get terminated.  It's the guy

9    running the clubs.  He's going to get terminated and he's

15:08    10    got this plan.

11          He can't double-dip.  He can't come in and

12    say, 'I have got this plan' that paid him, greatly, more

13    money, a hundred and some-odd thousand dollars more money,

14    than he would have made if he had been terminated when the

15:09    15    club sells and it's a special deal for him.

16          THE COURT:  Where is the one percent?

17          MR. NIELSEN:  And, Your Honor, I think the copy you

18    have is missing that particular page.

19          MR. OBERTI:  I included what he's referring to as

15:09    20    "the separate plan" as part of the little packet of key

21    documents.

22          MR. NIELSEN:  Your packet, Your Honor, doesn't have

23    the eligibility requirements.

24          MR. OBERTI:  Well, actually, it does on the first

15:09    25    page, the one you're referring to about you're not an

1    employee if you're compensated by special fees or employed

2    pursuant to a special contract --

3              THE COURT:  Page 2 of something.

4              MR. NIELSEN:  Yeah, Page 2.  I think Your Honor

15:09  5    said that if one of the clubs is sold and he got fired he

6    gets both, but I think that's the point, is he's not

7    supposed to get both.

8              THE COURT:  No, he wouldn't get both.

9              MR. NIELSEN:  He's supposed to get one, and if --

15:10  10             THE COURT:  If it sells, he gets -- but that's a

11    commitment of the seller.  You're telling me the buyer in

12    this instance recommitted to the one percent.  Where's that?

13             MR. NIELSEN:  We assume all liabilities --

14             THE COURT:  But that was done.

15:10  15             MR. NIELSEN:  Right.

16             THE COURT:  I think that's a one-shot deal.  You

17    can renew it, but The Woodlands made that contract.  They

18    paid him.  That was over.

19             MR. McDOWELL:  But it was subject to the plan, Your

15:10  20    Honor, and the plan was never modified.

21             THE COURT:  Well, wait a minute.  I don't think the

22    side -- Where is the one percent?

23             MR. OBERTI:  It's in this document, Your Honor,

24    which you have a copy of, the one that's marked "Draft".

15:10  25                  But if I had come in here seeking the one

1   percent, I would have probably, rightfully, sanctioned for

2   it.

3            MR. NIELSEN:  But he got paid under it.

4            MR. OBERTI:  Not after the plan was instituted.

15:10   5            THE COURT:  Who cares?  Wait a minute.  This he got

6   paid in '07 by somebody entirely different.

7            MR. OBERTI:  Correct.

8            THE COURT:  I want to see where Howard Hughes

9   committed to pay him one percent if it sold again.

15:11  10            MR. McDOWELL:  Well, Your Honor, it's an existing

11   plan.  It goes on.  It's not a -- And the plan was never

12   modified.  The plan was still there.

13            THE COURT:  Actually, this is not a benefit.  This

14   has adjusted his salary.

15:11  15            MR. OBERTI:  A couple of points, Your Honor.  They

16   say that, in essence -- through, apparently, very clever

17   drafting, that's, in essence, a severance plan designed to

18   replace the benefit I am seeking.  He never got any such

19   document.  I am just seeking what the plan entitles him to.

15:11  20   More fundamentally, he got that --

21            THE COURT:  Wait a minute.  He got this from an

22   earlier employer on a deal they had.

23            MR. OBERTI:  Correct.

24            MR. NIELSEN:  Your Honor, that's -- this is between

15:11  25   The Woodlands Operating Company.  That continued to be his

1  employer.  There was not a change in his employer.  We just

2  acquired the partnership interest of this entity.

3      THE COURT:  All of it.

4      MR. NIELSEN:  So, this entity continues, and that's

15:12  5  why it didn't have to be reaffirmed; because we bought the

6  entity.  So, this entity was his employer when he was

7  terminated.  That's why nothing needs to be renewed.  And

8  all the liabilities continue under the partnership agreement

9  that is part of the plan --

15:12  10      THE COURT:  Why is this called "Draft"?

11      MR. McDOWELL:  Your Honor, we don't know why it was

12  called "Draft", but, under our course of dealing, we dealt

13  with it as if it was a final agreement and we paid him, as

14  if it were a final agreement, $340,000.  So, the unfortunate

15:12  15  word there "Draft" -- via course of dealing and via he

16  walked away with $340,000, this is actually --

17      THE COURT:  He didn't walk away.  He kept working.

18      MR. McDOWELL:  Well, he took the $340,000 and put

19  it in his bank account, I suppose.  But the point of the

15:13  20  matter is --

21      THE COURT:  He could have mailed it to his bank.

22      MR. OBERTI:  Howard Hughes is a stranger to that

23  agreement.  They're trying to pass it off as a disguised

24  severance pay plan.

15:13  25      THE COURT:  Wait.  Wait.  They just said that

1  Howard Hughes bought the company and the company was still

2  who was paying him.

3          MR. OBERTI:  Correct.

4          MR. McDOWELL:  Woodlands Operating Company.

15:13  5          THE COURT:  Is that right?

6          MR. OBERTI:  That is correct.

7          THE COURT:  So, he's not a stranger to The

8  Woodlands Operating Company.

9          MR. OBERTI:  No.  I am saying, at the time the 340

15:13  10  was paid in '07, Howard Hughes wasn't in the picture.  They

11  were a stranger to it.  That's my point.  It seems --

12          THE COURT:  If somebody in '08 had sold their

13  10 percent interest to sue somebody else, they would still

14  be a stranger, but the contract is with the company.

15:13  15          MR. OBERTI:  Right.

16          THE COURT:  And, so, now --

17          MR. OBERTI:  My point is how can that be -- They're

18  saying, essentially, that replaces the severance benefit

19  that the plan provides.

15:14  20          THE COURT:  Wait a minute.  Why don't we have The

21  Woodlands Operating Company, LP, as a party?

22          MR. McDOWELL:  Your Honor, I'm sorry.  I didn't

23  hear what you said.

24          THE COURT:  Why don't we have The Woodlands

15:14  25  Operating Company, LP, as a party?

1    MR. NIELSEN:  Because he's suing under the Howard

2  Hughes plan, which includes The Woodlands Operating Company

3  under it.  It includes --

4    THE COURT:  So, then, in '12, before he was fired,

15:14   5  these were all superceded by the parent.

6    MR. NIELSEN:  No.  They were not.  There is

7  another -- there is a cash flow participation award also

8  referenced in that.  That's the only thing that got changed

9  by the Howard Hughes plan.

15:14  10    THE COURT:  What happened to it?

11    MR. NIELSEN:  They got rid of that plan because

12  that plan didn't justify it being applied to a lot of senior

13  executives, and they replaced it with the separation plan at

14  issue here, but he continued --

15:15  15    THE COURT:  So, before '06 there was no separation

16  plan?

17    MR. NIELSEN:  There was a different one.

18    THE COURT:  How different?

19    MR. NIELSEN:  We don't have it.  It's just not in

15:15  20  the records.

21    THE COURT:  So, this separation benefit on Page 6

22  is the Howard Hughes separation benefit?

23    MR. NIELSEN:  That's the Howard Hughes separation,

24  but nothing ever was done --

15:15  25    THE COURT:  But, then, where is this in the Howard

1    Hughes plan?

2           MR. OBERTI:  That's what they're trying to say.

3    I'm sorry.

4           THE COURT:  You'll have your chance not to answer

15:15   5    questions.  Now is his chance to not answer questions.

6           MR. NIELSEN:  We're not contending that's a

7    separation plan.

8           THE COURT:  No.

9           MR. NIELSEN:  What that is is a special

15:15   10   arrangement --

11          THE COURT:  Where is this in a plan?

12          MR. NIELSEN:  It is not in a plan because it is not

13   a plan, Your Honor.  It is a special arrangement.  And I

14   want to make that very clear.  It doesn't have to be a plan.

15:16   15          All it says is that, if you are paid by

16   special fees or a special arrangement, you're excluded.

17   And, so, that's why it wouldn't be included in the plan,

18   because that's covered elsewhere, and that document

19   continued -- as a matter of fact, Mr. Langley -- his

15:16   20   September 24th declaration talks about it continuing.

21          MR. OBERTI:  You have the declaration in front of

22   you.

23          THE COURT:  So, you're telling me the April 18,

24   2006, sale clause has been ratified by Howard Hughes itself

15:17   25   after '12?

1          MR. NIELSEN:  I don't think so, because that's his

2    compensation deal and his employer didn't change.  Who owned

3    his employer is the only thing that changed.  So, I think,

4    from a technical standpoint --

15:17    5          THE COURT:  Is this in the Howard Hughes Benefits

6    Plan?

7          MR. NIELSEN:  That is not in the Separation

8    Benefits Plan individually, as well as there is -- no one

9    else's employment contract --

15:17    10          THE COURT:  I'm not talking about other people.  I

11    have got one guy.  That's enough.

12               So, in the 2012 reformed ERISA plan --

13          MR. NIELSEN:  Correct.

14          THE COURT:  -- what is the severance benefit?

15:17    15          MR. NIELSEN:  For him, if he was eligible, it would

16    be --

17          THE COURT:  It's this document where we have been

18    reading from Page 2 and Page 6?

19          MR. NIELSEN:  That is the --

15:18    20          THE COURT:  That's what it says.

21          MR. NIELSEN:  That is the separation plan, but

22    that's a very -- it's not -- it doesn't cover all

23    compensation.

24          THE COURT:  I don't --

15:18    25          MR. OBERTI:  I think we agree on the amount if he

1    were eligible.  They're not saying he's eligible.

2                    (Simultaneous dialogue)

3            THE COURT:  -- they paid him.  That's easy.

4    They've got payroll records.  So does your guy, presumably.

15:18  5            MR. OBERTI:  Yes, Your Honor.

6            THE COURT:  When Jesse Jones of Houston retired --

7                    (Off the record)

8            THE COURT:  I'm not sure I got a definitive answer.

9            Does The Woodlands Operating Company take the

15:19  10   position that this April 18th, 2006, memorandum persisted

11   until he left?

12           MR. NIELSEN:  Yes, sir.

13           MR. OBERTI:  May I say one thing, Your Honor?

14           MR. McDOWELL:  Your Honor, just to be very clear on

15:20  15   our position:  The cash flow participation award was

16   modified; however, the club sale incentive award was not.

17           THE COURT:  That's the only one we're worried

18   about.  Even he didn't sue over something --

19           MR. McDOWELL:  But your question was does the memo

15:20  20   persist, and I want to be sure that that part of the memo

21   that we're talking about did persist.

22           THE COURT:  Paragraph 4.

23           MR. McDOWELL:  There you go.

24           THE COURT:  As lawyers say, "for the record".

15:20  25   That's all we do around here.

1           MR. NIELSEN:  Do you hate that when they say it?

2           THE COURT:  We're in here with a court reporter.

3 We're in here with a court reporter trying a case.  I mean,

4 at the trial they'll say, "for the record, Your Honor".  I

15:20   5 want to say, "That's all we do.  Nobody is here for fun.

6 We're making a record."

7           You know, under the last section, or whatever

8 it is, paragraph 4, you can't fire him the day before it

9 closes -- it's a hypothetical -- but you have got to be an

15:21 10 employee at the time the sale closes.  So, you can't go in

11 and fire everybody who is eligible the day before it closes.

12 That's so they don't think, 'Well, you had a contract, but

13 it fell through; so, you owe me anyway.'  But that's not the

14 way I'd word it.

15:22 15           MR. OBERTI:  Your Honor, I mean --

16           THE COURT:  Your turn.

17           MR. OBERTI:  -- I mean, our position is, whether

18 that was binding on the post -- the purchase of Howard

19 Hughes doesn't affect his right to benefits under the plan.

15:22 20           That said, it's worth noting that they

21 themselves just conceded and conceded in paragraph 33 of

22 their motion, after they bought TWOC, they themselves, as

23 they say, changed or eliminated one of the bonuses that's

24 not at issue in this case.  That would suggest, consistent

15:22 25 with the word "draft" and then no one signed it and the fact

 1  that, as another document they have in front of you, they

 2  expressly or upon purchasing the company revoked all bonus

 3  bands -- all that evidence suggests that they themselves did

 4  not regard themselves bound by this document after they

15:22  5  purchased the company.

 6      THE COURT:  There is no question that the company

 7  considered this binding.  They paid -- what was it --

 8  $340,000?

 9      MR. McDOWELL:  Correct.

15:23  10     THE COURT:  So, when the contingency was met, they

 11  paid?

 12     MR. OBERTI:  In '07, before Howard Hughes purchased

 13  them, correct, and before the plan existed, correct.  The

 14  plan didn't even exist then.

15:23  15     THE COURT:  There's nothing wrong with this.

 16     MR. OBERTI:  Right.

 17     THE COURT:  Scrivener's problems.

 18         The essence is your guy got a third of a

 19  million dollars under that piece of paper; so, it is

15:23  20  a) good and it's too late to quibble about the word "draft"

 21  and all that other stuff.

 22     MR. OBERTI:  Sure.  But that doesn't somehow

 23  transform him as being ineligible under the language they

 24  rely on in the 2012 plan.

15:23  25     THE COURT:  In the 2012 plan is there a sale for

1    anybody?

2         MR. OBERTI:  No.  I don't believe so.

3         MR. NIELSEN:  It's a very narrow plan.

4         MR. OBERTI:  On Page 1 --

15:23   5         MR. McDOWELL:  It's not to be a complete, all

6    benefits, all employees plan.  It's a narrow plan where

7    people would get laid off, essentially.

8         THE COURT:  Wouldn't it cover all employees?

9         MR. NIELSEN:  It covers -- It doesn't cover -- what

15:24   10   I am saying is it doesn't cover all possible benefits

11   employees get.

12        MR. McDOWELL:  And it doesn't cover all

13   circumstances under which somebody would leave.  In other

14   words, if someone is terminated for cause --

15:24   15        THE COURT:  For embezzlement.

16        MR. McDOWELL:  -- there you go -- they don't get

17   it.

18        THE COURT:  I have had them sue for it.

19        MR. NIELSEN:  One thing I want to point out is, if

15:24   20   this memo turned into a contract, it's the same analysis,

21   because a contract is, also, if you have a special fee,

22   special arrangement, per a contract --

23        THE COURT:  But "had" would be the operative word

24   here.

15:24   25        MR. NIELSEN:  But the contract wouldn't be talked

 1   about in the plan, you see, and that's why it's not

 2   necessary to talk about --

 3        THE COURT:  If they're compensation contracts,

 4   they're specific.  You don't change the plan every time you

15:24  5   raise someone's salary or you decide to give Charlie a

 6   commission.  The amount of the bonuses can be zero or

 7   somewhere in between.  That's administration of the company,

 8   not of the plan.

 9             He had this deal with the company.  It

15:25  10  happened.  He got paid.  Everybody is happy.  The benefit

 11  went away.  He left.

 12       MR. NIELSEN:  We don't agree the benefit went away

 13  until he left his employment, and that's what I am saying.

 14       THE COURT:  No.  The benefit is either there or

15:25  15  it's not there.  You're saying unearned -- But you told me,

 16  after '12, there is no contract, there's nothing about sales

 17  fees.

 18       MR. NIELSEN:  Well, let me be clear.  There's

 19  nothing in the Howard Hughes Separation Benefits Plan about

15:26  20  that particular issue, but there's also nothing in that

 21  document -- it doesn't list all the employees who have

 22  contracts.  And if you have a contract --

 23          THE COURT:  Where is the contract with Langley?

 24          MR. McDOWELL:  You have it before you.  It's the

15:26  25  draft.

1          MR. NIELSEN:  He doesn't have a contract because it

2     is a special arrangement for a contract.  What I am saying,

3     Your Honor, is -- You mentioned that this isn't listed, but

4     the executives who have contracts, who also would be

5     separately excluded, they're not listed in the benefit plan

6     either.

7          THE COURT:  Wait a minute.  I am just trying to

8     figure out....

9               So, what did you say was rescinded by Howard

10    Hughes?

11         MR. McDOWELL:  If you -- The document that we're

12    looking at there, Your Honor, there's two different types of

13    payments possible.  One is payment which is the one percent

14    deal if either of these two clubs are sold, The Woodlands

15    Country Club or the Club At Carlton Woods.  The Woodlands

16    Country Club was sold in '07.  They're saying, 'Well, if the

17    Club At Carlton Woods was sold, you would have got the one

18    percent even in 2012.'  But, of course, it never was, 'But

19    you would have.'

20              My point is there's an earlier provision that

21    talks about something called the "Cash Flow Participation

22    Award", and they concede in the briefing and today they

23    concede that they unilaterally came in after they bought

24    this company and said, 'You don't get that anymore, Buddy,'

25    which my point is, cool, you get to do that.  It's a draft

1    and it ain't binding.  You can eliminate all the bonus

2    plans, which they did that, and that's in the record, too.

3         MR. NIELSEN:  Your Honor, that was part of this

4    document, the senior incentive plan, which gives The

15:27  5    Woodlands Operating Company the power to re --

6         THE COURT:  No.  He's not worried about that.

7         MR. NIELSEN:  But he's mixing apples and oranges

8    here.

9         THE COURT:  No.  What I am trying to find out....

15:27  10        Langley had a deal -- he had an arrangement

11    whereby he worked and you paid him.  I don't know how you

12    know what that deal is.  It's not the ERISA plan.  They

13    don't ever determine what your functioning salary is.  It

14    has to be a salary plan.  Or, routinely, say this is not the

15:28  15    whole salary plan.

16         MR. NIELSEN:  This is his deal.  And, Your Honor,

17    we know the '06 memo is his deal because you can look at his

18    compensation, his annual compensation, and pursuant to this

19    it's $250,000, the exact compensation he was receiving when

15:28  20    he left.  So, we know this memo was his deal in 2012 and

21    they were performing under this memo.

22         THE COURT:  Except for paragraph 3.

23         MR. McDOWELL:  Correct.

24         THE COURT:  Did he get the 10 percent bonus until

15:29  25    the club was sold?  You didn't deal with him until the club

1    was sold.

2          MR. NIELSEN:  As far as his bonus payment?  Your

3    Honor, I don't believe so, but I will admit I don't think

4    that's in the record.

15:29    5                    (Simultaneous dialogue)

6          THE COURT:  -- for managing two clubs.  He was

7    managing one and it says he doesn't get it.

8          MR. NIELSEN:  He was managing both clubs.

9          THE COURT:  Even after the sale?

15:29    10          MR. NIELSEN:  Yes.

11          MR. OBERTI:  How could that be if one of the clubs

12    was sold in '07?

13          MR. McDOWELL:  Same entity.  In other words, it was

14    sold into the entity.

15:29    15          MR. OBERTI:  Sold into an entity that was owned by

16    Howard Hughes?

17          MR. McDOWELL:  Not at the time, but Howard Hughes

18    subsequently acquired it.  He left this operating company.

19          MR. OBERTI:  Doesn't that kind of kill your

15:30    20    argument that if he sold the Carlton Woods there would be no

21    clubs to manage?

22          MR. NIELSEN:  No.  If he sold both clubs there

23    wouldn't be any club to manage.  But Miss Engle said -- and

24    that's why she said he doesn't get both deals; because he

15:30    25    had a special deal, because he's the guy that, if you sell

1    both these clubs, he's the one getting fired and he gets a

2    better deal.

3          THE COURT:  I am stuck with what you all actually

4    did.

15:30  5          MR. OBERTI:  Here's their point.  They're trying to

6    argue that based on a 2006 draft memorandum, which they

7    partially rejected -- based on that alone and the fact that

8    after they purchased it and after they created the plan that

9    didn't even exist back then -- because of that 2006 memo,

15:30  10   that means that Mr. Langley was, pursuant to 1.5(a) of the

11   plan, compensated by special fees or employed pursuant to a

12   special contract or arrangement.  That's their argument.

13          And if you read my briefing, including

14   *Koehler*, which is a case that their firm handled and lost at

15:31  15   the Fifth Circuit, you'll see that that argument has

16   absolutely no chance of withstanding legal scrutiny even

17   under the abuse of discretion standard.  I am one thousand

18   percent confident of that.

19          THE COURT:  You're relying on the Court of Appeals.

15:31  20          MR. NIELSEN:  I think the facts of this case are

21   dramatically different.  That case has to do with a

22   specialist benefits health care plan.

23                (Simultaneous dialogue)

24          THE COURT:  A district judge applied Aquinum's

15:31  25   Razor to the reasoning, and the position of one party said,

1    well, it is wholly implausible because there were a couple

2    of easier, simpler answers to the known facts.  That guy

3    actually appealed -- or probably appealed it.  His lawyer

4    argued that Aquinum's Razor didn't count and it wasn't law.

15:32    5    He lost.

6         MR. NIELSEN:  Your Honor, what I don't understand

7    about the Plaintiff's argument is how do they get this memo

8    for part of Plaintiff's case and not the other, because

9    they're relying on it for his salary, because this says what

15:32   10    his salary is going to be.

11         THE COURT:  I understand.

12         MR. NIELSEN:  And, so, you can't take part and

13    reject --

14              (Simultaneous dialogue)

15:32   15         THE COURT:  -- from his side because he put the

16    check for paragraph 4.

17         MR. OBERTI:  He was getting paid before he got

18    that.

19         MR. NIELSEN:  But this --

15:32   20         MR. OBERTI:  He was employed not pursuant to that

21    plan.

22         THE COURT:  Don't talk to him.  I am here for you.

23    Talk to me.

24         MR. OBERTI:  I apologize.

15:32   25              Okay.  Aquinum's Razor -- we'll go with that

1    here, too, because Langley got fired and he's like, 'What am

2    I going to get?'

3                 And you're like, 'Here's a severance of

4    42,000.'  Where they came up with that number I don't know.

15:32    5    I am sure they have an explanation for that.

6                 He's like, 'Well, what do you mean?  I am

7    entitled to the severance under this plan.'

8                 And the manager says to him -- this is in his

9    affidavit -- 'What are you talking about?  I don't know

15:33   10    anything about a severance plan.'

11                 So, then we have to go to this dog and pony

12    show where we submit a request for payment to the HR

13    manager, who works for the manager who said he didn't know

14    of the plan, and said, 'You're not going to get the money.'

15:33   15    What chance do you think he has of winning that appeal in

16    front of their HR manager?

17                 All right.  So, what's really happening here

18    is the managers got ticked off at Langley because he wanted

19    to hold their feet to the plan that they put in place.  They

15:33   20    got this HR puppet to deny it, and now they have hired some

21    really good lawyers to try to --

22                 THE COURT:  Is the HR puppet any different than

23    "Langley's lawyer stooge"?

24                 MR. OBERTI:  Well, she gets paid no matter what.  I

15:33   25    am on contingency.

```
 1          THE COURT:  My point is insulting whoever -- that
 2     is not a solution.
 3          MR. OBERTI:  Sure.  I'm not insulting her.  She's
 4     doing her job.
 5          THE COURT:  She's been the human resources person.
 6     That's reason enough to be sympathetic.
 7          MR. OBERTI:  They dumped this on her.
 8          THE COURT:  They generate a whole bunch of stuff so
 9     it looks like they're doing something constructive.
10          MR. OBERTI:  They did it here.
11          THE COURT:  My favorite is they fired Jim Bob the
12     third time he was caught sleeping on the job.  And, so, a
13     week or so after he's fired, unceremoniously, he gets a
14     letter from human resources saying 'We loved having you with
15     us.  You were a wonderful employee and we just wish nothing
16     but the best for you' and all.  He comes in and says,
17     'That's not the reason they fired me.  They would have hired
18     me back.'
19               Shutting up is sometimes the best thing you
20     can do.
21          MR. McDOWELL:  Yes.
22          THE COURT:  When a company has fired somebody,
23     nobody should communicate with that person.  I mean, HR can
24     send benefits, but send a check.  Don't talk to him.  Don't
25     send him e-mails hoping he and Mary Beth have a wonderful
```

1    life together, because then they'll sue you because she

2    turned out not to be a great wife.

3            They really had to do the math on the

4    commission.

15:35    5            MR. NIELSEN:  Documenting it, I guess, Your Honor.

6            THE COURT:  Yeah.  But that was hard.

7            MR. NIELSEN:  Yeah.  Exactly.

8            THE COURT:  All right.

9            MR. OBERTI:  Taking the advice on the shutting up

15:35   10   is the best part that --

11           THE COURT:  Well, that wasn't meant for you.  I

12   wasn't directing it to you.

13                  (Simultaneous dialogue)

14           THE COURT:  How long did he work for Howard Hughes?

15:36   15           MR. NIELSEN:  About ten years.  Howard Hughes?  He

16   never worked for Howard Hughes.  He worked for The Woodlands

17   Operating Company.

18           THE COURT:  After the change of control.

19           MR. OBERTI:  It was only called The Woodlands

15:36   20   Operating Company or Corporation.  He started there in 2002.

21           THE COURT:  The Woodlands obtained control of the

22   company.

23           MR. NIELSEN:  Woodlands Operating Company?  Yes,

24   sir.  And he worked there, I believe, about another year,

15:36   25   two years.

```
 1          THE COURT:  All right.  Let me look at it.  Anybody
 2     want to add something?
 3               You have been mercifully quiet.
 4          MR. HORTON:  I have been doing my best to keep
 5     quiet, Your Honor.
 6          THE COURT:  Anything to add?
 7          MR. SULLIVAN:  No, sir.
 8          MR. NIELSEN:  Well, Your Honor, the only thing I
 9     would add:  As you know, what we're here on is the
10     eligibility under the plan.  Even if you disagree with
11     Miss Engle -- you can disagree and she still can be right,
12     but there is a separate issue that is not before the Court,
13     and that would be on the involuntary termination, and that's
14     not in the suit.  That was reached at the termination level
15     because he was excluded from the plan.  So, that's still out
16     there.
17          THE COURT:  Well, I thought there was no question
18     that he was a good employee.
19          MR. NIELSEN:  Well, that's what they say.
20          THE COURT:  Well, what do you say?  Don't repeat
21     what he says.
22          MR. McDOWELL:  It's not in the record.
23          THE COURT:  Well, wait a minute.  Did you fire him
24     or --
25          MR. NIELSEN:  Yes, he got fired, and his own letter
```

15:36 (line 5)
15:36 (line 10)
15:37 (line 15)
15:37 (line 20)
15:37 (line 25)

1    indicates that.

2          THE COURT:  Okay.  And why did he get fired?

3          MR. NIELSEN:  He got fired for videotaping a

4    commercial in his underwear using the company logo.

15:37  5    However, he raised some issues about this self-evaluation

6    and his good evaluation and that Engle would have to go back

7    and say that because he --

8          THE COURT:  My understanding was he was doing a

9    good job, but, in a dismal exercise of judgment, decided to

15:38  10    promote, with the company logo in the background, some

11    product with nobody's permission.  Is that about right?

12          MR. OBERTI:  That's part of -- Yes, Your Honor.  I

13    don't believe he was fired for that, because it was a long

14    time after that he was fired.

15:38  15          THE COURT:  How long?

16          MR. OBERTI:  Some 90 days or something like that.

17          THE COURT:  It takes human resources 90 days to do

18    anything.

19          MR. NIELSEN:  I just want to point out, Your Honor,

15:38  20    that Miss Engle had not made that determination based on

21    Mr. Oberti's point, but Mr. Oberti -- in his own letter, I

22    think it seems very clear that they told Mr. Langley

23    'Because of what you did, you need to go look for another

24    job,' and, in my world, that's getting fired.

15:38  25          THE COURT:  There are policy disagreement firings

1    which don't go to the integrity or the behavior of the

2    person, and the company, as a whole, decides to put a plant

3    in Ponca City, Oklahoma, and McKinsey looked at it and all

4    that and it turns out not to work, but the owners are

15:39    5    looking for blood because they're unhappy with the results.

6    So, sometimes somebody leaves.  That's why you should fire

7    some of the officers every once in a while.

8         MR. OBERTI:  So, there is a case from 1999 out of

9    the Fifth Circuit.  It's *Vega*.  And what that case

15:39   10    essentially says is, if the plan administrator had an

11    opportunity to rule on an issue -- a full and fair

12    opportunity -- and he didn't rule on it and now they come in

13    after they lose on what they did rule on and say, 'No.  Send

14    it back to the administrator so they can do some more

15:39   15    bureaucracy and waste some more time' -- 'No.  You had your

16    opportunity.'

17         And *Vega* is dead on point here because they're

18    right.  I didn't dodge that issue by writer's pride.  You

19    can read my letter.  You can verify it under oath.  I teed

15:39   20    it up.  Right?  I expected her to say, 'Oh, we're going to

21    take the position he was fired for cause.  He's not even

22    eligible.'

23         THE COURT:  Well, it's not her to take the

24    position.  They didn't take the position.  Remember, when

15:40   25    she's administering the plan, she's not working for the

1    company.

2            MR. OBERTI:  Right.

3            THE COURT:  And, so, it's not for her to raise all

4    the issues.  It's for them to raise the issue and for her to

15:40    5    adjudicate it.

6            MR. OBERTI:  Right.

7            THE COURT:  Did the company present to her a

8    package that included the allegation he was fired for cause?

9            MR. OBERTI:  I don't know if they did or not, but

15:40   10    certainly they had the opportunity.  She's their HR manager.

11            THE COURT:  They had the opportunity and she had

12    the opportunity and, whether they did or not, she didn't

13    rule on it.

14            MR. OBERTI:  Exactly.

15:40   15            THE COURT:  That's what he said.

16            MR. OBERTI:  That's exactly right.  And what *Vega*

17    says is, in that precise circumstance, where I have put the

18    issue in play, they had the opportunity and decided not to

19    pass on it, then they lose on what they did rule on in

15:40   20    court.  *Vega*, if you read it, says, 'Hey.  That ship has

21    sailed.  This is a small matter for purposes of efficiency

22    since you already had a full and fair chance.  Let's not

23    send this back and forth and drag this guy through another

24    year of' --

15:41   25            THE COURT:  The purpose of ERISA is efficiency.

1          MR. OBERTI:  Exactly.

2          MR. McDOWELL:  Page 13 of *Vega* --

3          THE COURT:  I will read the whole thing.

4          MR. McDOWELL:  Okay.  "In some special

15:41  5  circumstances, a remand to the administrator for further

6  consideration may be justified."

7          So, *Vega* clearly sees that there is going to

8  be an issue, just like the issue in this case, where the

9  woman looked at it and she said, 'Subject matter

15:41  10  jurisdiction.  This guy was not an employee; therefore, this

11  plan doesn't cover it.  He's not an employee' --

12          THE COURT:  I got that.

13          MR. McDOWELL:  -- 'under the plan.'

14          THE COURT:  That's not the holding of *Vega*.

15:41  15          MR. McDOWELL:  Well, but I'm telling you, Your

16  Honor --

17          THE COURT:  No.  That's not the holding of *Vega*.  I

18  don't know what the holding is.  I don't know whether he

19  knows.

15:41  20          MR. OBERTI:  I cited it.

21          THE COURT:  I know, but that doesn't mean you read

22  it.  The modern rule of pleading is "download and hope".

23          MR. OBERTI:  Well, if you read my complaint, I

24  definitely did that.

15:41  25          THE COURT:  So, my point is that quotation cannot

1  be the holding.  The holding has to apply to the case at

2  hand, not sometimes somewhere there may be circumstances.

3  That's an attempt to keep lawyers from twisting it to say

4  it's an absolute rule, that it can never be done.  His

15:42  5  argument is that these are not circumstances where an

6  administrative remand is justified.  I don't know, but I

7  will let you know.

8          You're sure?

9          MR. NIELSEN:  Silence is golden, Judge.

15:42  10          THE COURT:  All right.  Off the record.

11

12                  COURT REPORTER'S CERTIFICATE

13          I, BRUCE SLAVIN, certify that the foregoing is a

14  correct transcript from the record of proceedings in the

15  above-entitled matter, to the best of my ability.

16

17                          *s/Bruce Slavin*
                        BRUCE SLAVIN, RPR, CMR
18

19

20

21

22

23

24

25